UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Mario Alejandro Lopez,

      Petitioner

v.

Brian E. Williams, et al.,

      Respondents

Case No. 2:19-cv-01308-APG-NJK

**ORDER**

Petitioner Mario Alejandro Lopez was convicted of multiple offenses related to stabbing his wife and son and assaulting his daughter, for which he is sentenced to imprisonment in Nevada state prison for 31.5 to 84 years.[1] ECF No. 29-2.  Lopez filed a second amended petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 17.  I previously determined grounds 2 and 3(b) are unexhausted and dismissed them without prejudice at Lopez's request. ECF Nos. 44–47.  I now decide the remaining grounds of the petition, in which Lopez seeks relief based on claims of prosecutorial misconduct, his conflict with trial counsel, and ineffective assistance of trial counsel.  For the reasons discussed below, I deny the petition (ECF No. 17), but grant a certificate of appealability for grounds 1(a) and 1(e).

/ / / /

/ / / /

---

[1] A jury convicted Lopez of two counts of attempted murder with the use of a deadly weapon, two counts of battery with the use of a deadly weapon resulting in substantial bodily harm constituting domestic violence, assault with a deadly weapon, burglary while in possession of a deadly weapon, and child abuse and neglect with the use of a deadly weapon.

I.    **Background**[2]

Maria Robles and Lopez were married and had seven children, including  sons, A.L. and M.L.J, and daughters, M.L. and L.L.[3] ECF No. 63-3 at 141–46.  On July 20, 2012, she worked at Al Phillips Laundry from 6:00 p.m. to 2:30 a.m., while her baby-sitter, Michelle, stayed at home with the children. *Id.* at 147–50.  A family court order prohibited Lopez from unsupervised visits and residing with her and the children. *Id.* at 146–47.  Lopez called Robles at work that night to offer her a ride home, but she refused his help. *Id.* 151–52, 155.  Lopez then texted her asking what time she would finish work and who would take her home, and she responded she would get a ride or take the bus. *Id.* at 153.  Robles said Lopez was "always" jealous and thinking about who would take her home, and why she did not want to go with him. *Id.*

Lopez arrived at Robles's workplace around 1:00 a.m., accompanied by their daughters, M.L. and L.L., having driven Robles's blue unregistered truck without permission. *Id.* at 153–55.  M.L., who was 14 years old at the time, testified Lopez switched the license plate from Robles's white truck to the blue truck and that she accompanied Lopez and her younger sister, L.L., to Robles's workplace because M.L. didn't want Lopez "to do anything." ECF No. 64-1 at 75–76, 78, 85–87.  M.L. said she texted Robles about what was happening and Robles "got really mad." *Id.*  M.L. said Lopez was always jealous and saying Robles was talking to someone else. *Id.* at 88.

---

[2] I make no credibility findings or other factual findings regarding the truth of evidence or statements of fact in the state court proceedings.  I summarize them solely as background for the issues presented in this case, and I do not summarize all such material.  No assertion of fact made in describing statements, testimony, or other evidence constitutes a finding made by me.  Any absence of mention of a specific piece of evidence or category of evidence does not mean that I overlooked it in considering the claims.

[3] Based on Local Rule of Practice LR IA 6-1(a), I use initials to refer to these witnesses, who were minors at the time of the offenses and when they testified at trial.

Robles testified that when Lopez arrived at her workplace, she told him she would not leave with him, and he said he would wait for her. ECF No. 63-3 at 154–56.  Robles told him to leave the girls in the lunchroom and to leave the premises. *Id.*  Lopez called her ungrateful and became angry but left. *Id.*  M.L. testified Lopez drove them home and on the way, he "was just saying that it was like me and my brother's fault that my mom doesn't want to go back with him" and that they were going "to pay." ECF No. 64-1 at 88–89.  M.L. said Lopez drove without swerving and responded to her questions, and although it appeared he had been drinking, she did not know whether Lopez was drunk or had been drinking. *Id.* at 89–90.  L.L. testified she was 13 years old at trial and that during the ride home that night, Lopez said Robles would "regret" not coming home with them. *Id.* at 121–22, 127.

M.L. testified that when they arrived home, she told Lopez to leave and saw him walk away from the house. *Id.* at 90–91.  M.L. locked the deadbolt on the front door because she was afraid of Lopez and that he might return to the house. *Id.* at 91–93.  Lopez texted Robles saying he left the girls at the house but was "insisting who [she] was getting a ride with," and how she would get home. ECF No. 63-3 at 156–57.  Lopez told her that if she took the bus, he'd be waiting for her at the bus stop. *Id.*  Robles said she had "no interest" in any contact with Lopez that night. *Id.*

Robles's shift ended at 3:00 a.m., and she got a ride home from a coworker, whose husband picked them up and dropped her off at her house. *Id.* at 157–60.  She was expected at her second job at 8:00 a.m. that morning and tried to unlock the front door of her house, but it was deadbolted from inside. *Id.* at 157, 161–62.  Lopez scared her by coming to the door from the direction of the blue truck. *Id.*  Lopez was argumentative and wanted to get back together with her and see the children, but Robles did not want to talk because she was tired, didn't have

much time to sleep, and he would "just go on and on, you know, talking about the same thing." *Id.* at 162–63.  Lopez called Robles a "bitch," and M.L. let Robles inside the house and secured the deadbolt. *Id.* at 161–65.  M.L. testified she heard Robles "saying like to let go of her and that she needed to go inside," and when M.L. opened the door, Robles spoke with Lopez, and he seemed "angry." ECF No. 64-1 at 93–94.  M.L. said she "shut the door at him." *Id.*

Robles went to the laundry room, which doubles as a bathroom, and Lopez called her on the telephone, but she told him they could talk on her day off. ECF No. 63-3 at 165–67.  Robles hung up on Lopez, and when she opened the door to leave the room, "there was [Lopez]." *Id.* at 168.  Robles did not know how Lopez got into the house, and she was afraid because he was "upset," his eyes were "bloodshot," and he "didn't look right." *Id.* at 169.  Lopez said he had just one question and asked whether he had a chance to reunite as her husband, but she told him, "No." *Id.* at 169.  Lopez responded by telling her she was "going to die," pulling out a knife, and stabbing her in the chest. *Id.* at 170–71.  Robles kept her iPod and cellular phone in her brassiere, and they blocked some of Lopez's attempts to stab her. *Id.*  Robles yelled for the baby-sitter, Michelle, and then Lopez stabbed Robles four times in the stomach and in the throat, back, hands, and next to her knee. *Id.* at 171–72, 175–76.  Deborah "Michelle" Arevalo testified she was Robles's baby-sitter, and she awoke at about 3:30 a.m. to Robles's screaming "Mario, No," and then saw Robles "drenched in blood" by the door to the laundry room, holding her belly and "barely walking," so she called 911. ECF No. 64-1 at 37, 41, 49–52.

M.L. testified she awoke to Robles yelling Lopez's name, left her bedroom, and saw Lopez stabbing Robles. *Id.* at 97–98.  M.L. said Lopez told her she was "going to die too" because everything was her fault too. *Id.* at 100–01.  M.L. said Lopez walked toward her with a

knife in his hand but did not raise it at her, and then her brother, A.L., came out of his bedroom, and Lopez went toward A.L., and they ended up in A.L.'s bedroom. *Id.* at 101–02, 117.

A.L. testified he was 15 years old on the night of the stabbings when he awoke to Robles having a conversation in the living room. *Id.* at 144–51.  A.L. said that earlier that afternoon, Lopez got "mad" after A.L. told him to leave the premises. *Id.* at 146–48.  When A.I. heard Robles "screaming for help" he exited his bedroom and saw Lopez. *Id.* at 150–53, 166.  Lopez called him a "puta," which means "bitch" in Spanish; pushed, shoved, punched, and stabbed A.I; pushed A.I. into his bedroom; and when A.L. tried to run, Lopez stabbed him again. *Id.*  Lopez stabbed him in the arm and back and then A.L. lost consciousness. *Id.* at 153–54, 164, 166.

Nine-year old M.L.J. testified he shared the bedroom with A.L. and saw Lopez stab A.L. three times with a knife. *Id.* at 139–42.  A.L. did not recall Lopez threatening to kill him when Lopez stabbed him, but he later heard Lopez say he would kill all of them. *Id.* at 159, 163–66.  M.L. saw A.L. exit his bedroom with "blood on his arm" and "back." *Id.* at 104.  Michelle did not see Lopez stab anyone or cut himself, but she saw A.L. come out of "the same hallway that his dad came out of" with "lacerations in his left arm" and "bleeding from his back." *Id.* at 56, 68, 70.

M.L. testified she heard thumps in A.L.'s bedroom, saw Lopez run out A.L.'s bedroom and out the front door of the house followed by L.L. who chased after him but returned when M.L. told her to come back so she could lock all of the doors. *Id.* at 102–04.  M.L. said Lopez returned, banged on the windows, cut his wrists and neck, wiped his blood on the windows, and yelled that he was going to kill all of them, and they were "going to die together." *Id.* at 105–07.  L.L. testified Lopez tried to get back into the house through the doggie door, but she blocked it with a chair, and Lopez told them to open the door to him or he would kill himself. *Id.* at 133–34.

L.L. saw Lopez through a window in the backyard "pretending that he was stabbing himself." *Id.* at 136. Robles saw Lopez leave with the weapon, but he returned, wanted back inside the house, and struggled with the door. ECF No. 63-3 at 174–78. She said she saw him through the window, cutting his forearms. *Id.*

North Las Vegas Police Department (NLVPD) officer Teresa Marsh found Lopez "moaning" on his belly on the back patio holding a knife. *Id.* at 3–9. Marsh said she would classify Lopez as unresponsive, although she did not attempt to speak to him. *Id.* at 10–12, 27. NLVPD crime scene analyst Wendy Radke testified she found "a screwdriver with apparent blood on it outside the front door," "a little pocketknife" on the patio floor "near large puddles of blood" where Lopez was found, a trail of blood around the exterior perimeter of the house, and "what appeared to be bloody stains on windows, doors, you name it. All over." *Id.* at 31, 34, 36, 44, 53, 60–61, 130. Radke found a path of blood from the house to the street and sidewalks. *Id.* at 56–57. Inside the home, Radke found apparent blood "everywhere" on the floor, walls, washer, dryer, and sheets on a twin bed. *Id.* at 54, 120–21, 125–26. Radke said neither the knife nor the screwdriver was submitted for forensic tests, "[b]ecause everyone knew the suspect in this case," and "he lived there at some point, so all of his DNA and fingerprints would already be in that scene." *Id.* at 134–35.

NLVPD detective Allen Antoniewicz testified he interviewed Lopez the next day and Lopez never claimed to be drunk or high, or that he ingested methamphetamine on the night of the stabbings but did indicate he took medication for a methamphetamine addiction.[4] ECF No. 64-1 at 168–71, 181–84, 188, 194–96.

_____

[4] Lopez's videotaped interview with police was played for the jury but not transcribed into the reporter's transcript. ECF No. 64-1 at 183. The State's argument that Lopez "admitted in his interview that he stabbed" Robles is consistent with Lopez's testimony that his statement

University Medical Center trauma surgeon Jay Coates testified he treated Robles and A.L for their stab wounds the night of the stabbings. ECF No. 63-3 at 79–82.  Robles required surgery for multiple potentially life-threatening stab wounds to her abdomen and right breast, caused by significant force. *Id.* at 91–96.  A.L. had potentially life-threatening stab wounds to the chest and back that penetrated the chest cavity and lung, and deep lacerations on his forearms that were "possibly defensive wounds." *Id.* at 84–90, 94.

Coates testified another surgeon treated Lopez for a non-life-threatening "superficial knife stab wound to the left chest" only one centimeter in length, plus multiple bilateral wrist lacerations. *Id.* at 96, 108, 110–12.  The hospital records indicate Lopez spoke but did not answer questions and received 15 sutures. *Id.* at 107–08.  Coates also testified that, according to the medical records, Lopez's wounds would not cause loss of consciousness, but that Lopez's vital signs "could be" consistent with someone under the influence of methamphetamine. *Id.* at 107–08, 112.  A juror asked Coates to "be more clear concerning defining meth vitals" and the doctor responded in relevant part:

> There's really no set of vital signs that would dictate or say, this person's on meth, or this person's not on meth.  They're really—they just don't exist.
>
> Now, what you can say are there are characteristics of people who are on methamphetamine.  Methamphetamine in and of itself tends to cause your heart rate to be increased; tends to cause your blood pressure to be increased.  The patients will often be diaphoretic; cold, clammy, kind of sweaty.  They'll act nervous.  They might twitch a little bit.  One of the common vernaculars is that they're twitching because of those.

*Id.* at 114.

to police was different than his trial testimony and defense counsel's concession in closing argument that Lopez stabbed Robles and A.L. *See* ECF No. 28-3 at 129, 152.

Lopez testified he started taking prescribed medication to quit using methamphetamine during the first week of July 2012.[5] ECF No. 28-3 at 16–18.  He explained that his addiction to methamphetamine caused him anxiety, anxiety is not controllable, and anxiety makes it "very difficult" to abstain from using methamphetamine. *Id.* at 40.  He thought the medication would control his anxiety so he would stop smoking methamphetamine. *Id.* at 19.  He took the medication as prescribed on the morning of July 20, 2012, but had never before taken the medication along with methamphetamine until the night of the stabbings. *Id.* at 19–20.  Lopez said he voluntarily left the family home and had received no legal paperwork for a protection order. *Id.* at 77–78.  He said he was not certain whether an order existed, or was "made up," because neither he nor Robles honored one. *Id.*  He explained that, although he did not live in the family home, Robles permitted him to "wash, bathe" and keep his clothing and medication there. *Id.* at 41–42.

Lopez said he received a call from Robles and M.L. on July 20 asking for help because the white truck was not working properly. *Id.* at 21.  He went "home," inspected the vehicle, and informed Robles the truck could not be used because the motor was damaged. *Id.* at 21–22.  He told Robles he would use the "blue" truck to give her a ride from work, but she told him "No" because it was unregistered. *Id.*  He said that, although he knew it was wrong, he placed the license plate for the white truck onto the blue truck and drove the blue truck, accompanied by M.L. and L.L., to Robles's workplace around 1:00 a.m. *Id.* at 22–23.

Lopez claimed he and Robles agreed he would pick her up but she "changed her character" and was "furious" that he put the white truck's license plates on the unregistered blue

---

[5] Lopez testified the medication was called "something like" "diopreopion." ECF No. 28-3 at 18.  In his postconviction proceedings, he presented a copy of his prescription for Wellbrutin and documents stating the generic name for Wellbrutin is "bupropion." ECF No. 32-14 at 51–60.

truck, and told him to leave. *Id.* at 23–24.  Lopez was surprised she was furious because they agreed to it, it was not the first time they did it, and M.L. told her what he did and that they were on their way. *Id.* at 54.  He said he told Robles, "But we're already here.  I'll wait for you, we can go, I'll leave you at home and everything's fine." *Id.* at 24.  He said, "she hung up" and he told his daughters "Mom got mad, we're going to have to go back." *Id.*  He said he went inside Robles's workplace and told her, "Maria, we're already here.  I'm going to wait for you and we can go.  Your daughters are here," but Robles was "extremely anxious," and said it was better that they leave. *Id.*  Lopez said they left around 2:10 a.m., he "did what she told" him to, and he returned the truck where he found it. *Id.*  He used to work at the same place as Robles and one of the men who worked there told him the reason Robles did not want him there was because she had a boyfriend there. *Id.* at 55.  Lopez did not recall telling his daughters Robles would regret not taking a ride home from him. *Id.* at 56–57.

Lopez testified he returned to the house around 2:35 or 2:40 a.m., and "fell off the wagon" by drinking a "big" bottle of beer that was in the refrigerator. *Id.* at 24–25.  Robles, however, testified she did not drink alcohol and did not have beer in her house that night. ECF No. 64-1 at 15.  Lopez said he also smoked "a lot" of methamphetamine with neighbors that night, including Sarah, George, and Luigi, and although he could not recall exactly what time that occurred, he estimated it was around 2:50 or 2:55 a.m. ECF No. 28-3 at 25–26.  He said he then waited inside the blue truck until Robles returned home. *Id.* at 26–27.

Lopez testified that when Robles returned, instead of going inside the house she went back out and disappeared; when she did not readily return, he walked toward the park and found her in a white truck kissing a man. *Id.* at 28, 64–67.  Lopez said he hit the truck window and asked, "What are you doing?" and the "boyfriend or lover got out," and they fought. *Id.*  He said

1  there were no weapons involved, the fight lasted "40 seconds, less than a minute," the other man

2  "won," and the man left "all angry." *Id.* at 29.

3      Lopez testified that after the man in the white truck left, he followed Robles back to the

4  front door of the house and asked her why she cheated on him. *Id.*  He said he tried to talk to her,

5  but she was furious and told him to leave, and he told her they had to come to an arrangement

6  because he asked for help. *Id.*  Lopez said his daughter M.L. opened the door and Robles

7  "pushed" him with a screwdriver. *Id.* at 29–30, 70.  He said he pulled the screwdriver out of

8  himself and, although there "wasn't a big wound," he was "bleeding a little." *Id.*  He said Robles

9  locked him out using the deadbolt, so he grabbed the phone and went inside the house through

10 the backdoor using his key as he had keys to the house and all the cars. *Id.* at 30–31.

11     Lopez claimed he and Robles began a telephone conversation over the phone, but when

12 he realized she was in the bathroom, he hung up and waited for her outside the bathroom while

13 they "continued the same conversation." *Id.* at 32.  He said she opened the door and attacked him

14 with a knife, and he did not remember anything after that "because everything was just a struggle

15 trying to take the knife from her." *Id.* at 32–33.  He said he felt "strange," "heat," and "cold," and

16 saw "red and gray and everything was spinning." *Id.*  He recalled running from the house and

17 one of his daughters yelled after him, and that he returned and saw Robles "all bloody." *Id.*  He

18 said he awoke in the hospital and had stitches on his arms and chest. *Id.* at 33, 35.

19     Lopez did not recall stabbing Robles, cutting his own wrists, trying to get into the house

20 through the doggy door, smearing blood on the kitchen window, having any interaction with

21 A.L., the police arriving, or the ambulance taking him to the hospital. *Id.* at 33–34.  Lopez

22 testified he had "no intention of hurting anyone" and he "just tried to defend" himself from

23

Robles's attack. *Id.* at 38. Lopez agreed his medical records from the night of the stabbings indicate he took no medications but that he stated he drank alcohol. *Id.* at 43.

Lopez agreed his testimony is different than his statement to police, but claimed he did not feel well during the police interview and was not sure he answered their questions correctly. *Id.* at 36.  He also agreed that according to his interview with police, he did not tell them Robles was in a truck with another man or that Robles stabbed him with a screwdriver. *Id.* at 72–73. When asked, "[Y]ou do tell the police that you got angry with her, followed her inside and hit her with the knife," he stated, "I told the policeman, I'll repeat it again.  I'm not entirely certain I responded properly or I responded correctly to those questions.  I was not feeling well." *Id.* at 88. He confirmed he told police he had no clue what happened to A.L. and still did not know at trial. *Id.* at 90.  When asked whether he committed the stabbings, he said, "I don't remember doing it." *Id.* at 92–93.  Robles testified as a rebuttal witness that she did not stab Lopez with a screwdriver or attack him with a knife and he did not have to remove a knife from her hands. *Id.* at 110.

After he was convicted and sentenced, Lopez unsuccessfully sought relief on direct appeal and in state postconviction proceedings. ECF Nos. 31-2; 34-13.

## II.     Antiterrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal standards for my consideration of the petition:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of
> the evidence presented in the State court
> proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10, 412) (internal citation omitted). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard

for evaluating state-court rulings, which demands state-court decisions be given the benefit of the doubt.") (internal quotation marks and citations omitted)).  The petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

A state court is not required to cite Supreme Court cases or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 357 U.S. 3, 8 (2002).  If a state court denies a federal constitutional claim on the merits without explanation, a federal habeas court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision," and then considers "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102.

Where there is no clearly established federal law, i.e., no holding from the Supreme Court, stating a particular standard or rule at the time of the state court decision, then by definition a petitioner cannot establish under AEDPA that the state court's decision was either contrary to or an unreasonable application of clearly established federal law. *See, e.g., Carey v. Musladin*, 549 U.S. 70, 76–77 (2006); *see also Williams,* 529 U.S. at 412 (interpreting "the meaning of the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States'" contained in 28 U.S.C. § 2254(d)(1) as referring to "the holdings, as opposed to the *dicta*, of the [Supreme] Court's decisions as of the time of the relevant state-court decision.") (emphasis in original).

/ / / /

/ / / /

/ / / /

/ / / /

## III.    Discussion

### A.    Ground 1—Prosecutorial Misconduct

Ground 1 alleges the prosecutor engaged in misconduct during cross-examination and argument that individually and cumulatively violated Lopez's rights to due process and a fair trial guaranteed by the Fifth, Sixth, and Fourteenth Amendments. ECF No. 17 at 7–19.[6]

#### 1.    Applicable Legal Principles

For purposes of habeas review under AEDPA, the "clearly established Federal law" governing claims of prosecutorial misconduct is set forth in *Darden v. Wainwright*, 477 U.S. 168

---

[6]For all grounds raised in the petition, Lopez claims the Supreme Court of Nevada's determinations are contrary to, or involved an unreasonable application of, clearly established federal law, and involved an unreasonable determination of the facts in the record. ECF No. 17 at 10, 13, 16, 18, 19, 39, 44. In his reply brief, however, Lopez claims for the first time that this court must conduct *de novo* review of grounds 1(a) and 1(c) because the Supreme Court of Nevada applied plain error review and, in doing so, failed to apply the proper standard to his federal constitutional claims of prosecutorial misconduct. ECF No. 59 at 7–10. I decline to consider new arguments Lopez raises for the first time in the counseled reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *see also Novosteel S.A. v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (holding that reply briefs *reply* to arguments made in the response brief and do not provide the moving party with a new opportunity to present yet another issue for the court's consideration).

Even if I were to consider the argument, the argument lacks merit because Lopez cannot overcome the presumption that the Supreme Court of Nevada adjudicated the federal constitutional claims on the merits. The claims were fairly presented, the court's affirmance order acknowledged and analyzed the claims, and the court cited authorities that cited the proper federal standards. *See Valdez v. State*, 124 Nev. 1172, 1189 n.42, 196 P.3d 465, 475 n.42 (2008) and *Thomas v. State,* 120 Nev. 37, 47 n.35, 83 P.3d 818, 825, n.35 (2004). Moreover, Lopez never filed a petition for rehearing in the Supreme Court of Nevada claiming that court failed to apply the correct legal standards to his federal constitutional claims. Finally, a state court is not required to cite Supreme Court cases or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Packer*, 357 U.S. at 8. Accordingly, review is deferential under AEDPA. *See Johnson v. Williams*, 568 U.S. 289, 298 (2013) (citing *Richter*, 562 U.S. 99); *see also, e.g.*, *Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017) (holding AEDPA deference applied to state court's plain error review of prosecutorial misconduct claims); *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1208 (11th Cir. 2013) ("AEDPA deference may apply to a state court's plain-error ruling."); *Douglas v. Workman*, 560

(1986).  *Parker v. Matthews*, 567 U.S. 37, 45 (2012).  "[A] prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 45 (quoting *Darden*, 477 U.S. at 181) (simplified).  "[U]nder *Darden*, the first issue is whether the prosecutor's conduct was improper and, if so, whether they infected the trial with unfairness." *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  The *Darden* standard "is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker*, 567 U.S. at 48 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

"It is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 180–81 (quotation omitted).  To determine whether a prosecutor's comments rise to the level of a due process violation, the reviewing court must examine the entire proceedings and place the prosecutor's remarks in their proper context. *Boyde v. California*, 494 U.S. 370, 384–85 (1990); *see also Darden*, 477 U.S. at 179 ("The prosecutors' comments must be evaluated in light of the argument that preceded it . . . ."); *see also United States v. Young*, 470 U.S. 1, 12 (1985) ("In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo.").  "A slight misstatement of law by a prosecutor can be rendered harmless by the court's proper instruction to the jury." *United States v. Mendoza*, 244 F.3d 1037, 1044 (9th Cir. 2001) (citing *Lingar v. Bowersox,* 176 F.3d 453, 460 (8th Cir. 1999) ("When counsel misstates the law, the misstatement is harmless error if the court properly instructs the jury on that point of law or instructs that the attorneys' statements and

---

F.3d 1156, 1170–71 (10th Cir. 2009) (holding AEDPA deference applies to plain error review "to the extent that the state court finds the claim lacks merit under federal law.").

1  arguments are not evidence."). A jury is presumed to follow the court's instructions. *Weeks v.*

2  *Angelone,* 528 U.S. 225, 234 (2000).

3        Factors to consider when determining whether a prosecutor's comment "rendered a trial

4  constitutionally unfair" include: (1) whether the comment misstated or manipulated the evidence;

5  (2) whether the judge admonished the jury to disregard the comment; (3) whether defense

6  counsel invited the comment; (4) whether defense counsel had an adequate opportunity to rebut

7  the comment; (5) the prominence of the comment in the context of the entire trial; and (6) the

8  weight of the evidence. *See Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th Cir. 2010) (citing

9  *Darden*, 477 U.S. at 181–82).

10        **2.    Ground 1(a)—Argument About Intoxication Instruction**

11        Lopez claims the prosecutor committed misconduct in violation of due process by

12  misstating the law of voluntary intoxication and shifting to Lopez the burden of proving he

13  lacked specific intent for the attempted murder, burglary, and assault charges. He asserts that the

14  prosecutor "improperly told the jury that intoxication could not be considered unless certain

15  physical attributes were present." ECF No. 17 at 9 (emphasis omitted).

16        **a.    Additional Background**

17        Before opening statements, the trial judge instructed the jury as follows:

18              As you know, this is a criminal case, and there are two
      basic rules you must keep in mind. First, the defendant is
19        presumed innocent unless proved guilty beyond a reasonable
      doubt. The defendant is not required to present any evidence or
20        prove his innocence. The law never imposes upon a defendant in a
      criminal case the burden of calling any witnesses or introducing
21        any evidence. Second, to convict, the State must prove beyond a
      reasonable doubt that a crime—that the crimes were committed,
22        and defendant is the person who committed them.

23  ECF No. 62-1 at 233.

In opening remarks, the defense argued the evidence would show Lopez consumed prescription medication, beer, and methamphetamine before the stabbings, did not recall some of the events of the night in question, and these facts would be relevant to the jury's determination of intent for some of the charges. *Id.* at 263–68.  Defense counsel used a rock-throwing hypothetical to illustrate the difference between general and specific intent:

> Let's say you and I get in an argument on a street corner over a parking place, and the argument gets heated, and we get angry.  And we say mean things to each other, and we use foul language, and we get angrier and angrier.  And I get to the point where I'm so mad I pick up a rock with the intent to throw the rock at you, and I hit you with the rock after I've intended to throw it.  And you get injured, and you go to the hospital . . . .
>
> If my intent was simply to hit you with the rock because I was mad at you, then that's not attempt[ed] murder, because attempt[ed] murder requires the intent—specific intent unlawfully to kill.  And these are the kinds of things that you're going to have to think about during your deliberation.  Was that—did that intent exist looking at the prior interaction, looking at the interaction after the fact, and looking at what happened in the moment?

*Id.* at 265.

In closing remarks, the prosecutor explained the intoxication instruction and argued Lopez's intoxication may have caused him to make bad decisions that he would regret, but he was not so intoxicated he lacked the ability to form specific intent to commit the crimes:

> Then talking about the intoxication, because we're going to get into the specific intent crimes, the intoxication instruction, when you look at it, what it breaks down to is that you may consider whether intoxication affects specific intent requirements.  However, it is not an excuse.  Intoxication is absolutely not an excuse for a crime.  You absolutely still are criminally liable if you commit a crime when you're under the influence of alcohol or drugs.
>
> The only reason you consider intoxication is if the person is so intoxicated that it stops them from being able to form the intent required to commit the crime.  So if you break it down a little bit,

you have to kind of separate.  We're not talking about bad decisions here.  We're talking about no specific intent.

So if somebody gets . . . really drunk and they start making bad decisions, they get in an argument with a family member that they might regret the next day or make a bad decision to do a bad karaoke rendition, I don't know.  There's a lot of bad decisions that people who are drunk or high make all the time.  But it doesn't mean that they didn't intend to make those decisions.

At the time they might have thought that singing that karaoke song was a great idea.  They didn't feel so good about it the next day, but it was just a bad decision.  It wasn't that they didn't intent to do it.  In order for intoxication to actually play a legal role, the intoxication has to be so extreme that the person can't even figure out what they're doing.

This is when you're down on the strip sometimes, if you end up going down there on a weekend and you end up seeing all the drunk tourists, this is like the worst of the worst one that you're seeing, the one who is slurring, they can't talk, they can't hold their head up, they can't look straight, they're stumbling, their friends are carrying them.  The person who literally can't figure out where they are or what they're doing.  That's the kind of intoxication that it takes in order to not be able to form—in order to be able to form intent.  It has to be so bad that the person literally doesn't even know what they're doing.

And one thing that's really important to think about here, especially in light of the fact that since the defendant's interview with the detectives he has lost all memory of stabbing his wife, I want to point out that the memory, whether or not someone remembers something after they're drunk has nothing to do with whether or not they intended it at the time.

You might—someone might be drunk or high and so they don't remember everything that happened when they were drunk or high.  But if someone else was there and tells them, oh, well, yep, I saw you singing that karaoke song, you marched right up there to the DJ and you said I want to look at that book, and I'm looking for this specific song and I want to find Ozzy Osbourne and I want to sing Crazy Train.

And I'm going to get up there and I'm going to sing Crazy Train and I'm going to do it the best I ever could, and the person goes up there and they sing the greatest, most embarrassing

rendition of Crazy Train ever in the history of karaoke. And the
next day they're like, oh, my gosh, I don't remember any of that.
Well, when you go back and ask their friends about it, their friends
tell this whole story about how determined the person was to sing
Ozzy Osbourne that night.

So clearly at the time the person intended to sing Ozzy
Osbourne. That doesn't mean that—that doesn't mean that they
were so intoxicated that they couldn't form the intent. Just because
they don't remember it the next day, they meant to do it when they
were doing it. So just—that's a good example of a bad decision
versus specific intent. And just because a person doesn't
remember it the next day doesn't mean that they didn't mean to do
it at the time. You've got to go back and look at what were their
actions at the time to figure out did they mean to do it when they
did it.

ECF No. 28-3 at 132–35.

The defense responded to this in closing remarks by emphasizing the jury should follow
the intoxication instruction and consider Lopez's intoxication in determining whether he could
formulate the specific intent to kill Robles and A.L, commit burglary, and assault M.L:

I'd like to begin this afternoon and speak with you about
these two charges of attempt[ed] murder with use of a deadly
weapon. As [the prosecutor] spent a considerable amount of time,
these charges require a specific intent to kill. In other words, if
you don't find that he had a specific intent to kill . . . you cannot
find him guilty of attempt[ed] murder with use of a deadly weapon.

If you determine after going back and reading these jury
instructions, and some of them are kind of technical, after reading
them and reviewing your notes and going over your own personal
observations, if you determine he did not have the specific intent to
kill, then you find him not guilty of those two counts, folks.

. . . .

[N]ow you heard [Lopez] testify that he had smoked meth
just prior to [Robles] arriving at the house. We also learned this
was the first time he mixed his prescription medication to help him
with his meth addiction. On top of that, he also had a tall boy beer.
That's what you heard.

. . . .

Folks, [Lopez] was found face down, passed out in the backyard.  You're passed out when you're high.  The State can't have it both ways, folks.  The defense is perfectly comfortable leaving it for you to decide whether or not [Lopez] was intoxicated in the early morning hours of this incident.  And we'll just let you decide that.  If you follow the law, you can't [sic] consider his voluntary intoxication in regards to whether he actually did have an intent to kill.

The State asked [Robles] about this crazy look she—the crazy look that she saw [Lopez] have when she opened the door to the bathroom.  [The prosecutor], in his opening argument, he quoted Sigmund Freud.  [The prosecutor] in her closing argument is talking about karaoke.  I'm going to quote somebody in my closing.  I'm going to quote [Robles].  [Lopez] didn't look right, there was something about his eyes, his eyes were bloodshot.

The State kept asking these witnesses, well, there's no beer in the house, right?  But it's this, ah-ha, got you moment.  He was high, folks.  Let me quote somebody else, his daughter, [M.L.].  It appeared as if he had been drinking.  These aren't my words, folks.

Now this is certainly relevant in determining whether or not he was under the influence of anything when you read that voluntary intoxication instruction, guys.  I want you to go back and I want you to read it carefully.

. . . .

Folks, let's talk a little bit about this burglary charge.  Burglary requires a specific intent that [the prosecutor] was speaking with you about.  Again, if you look at the voluntary intoxication instruction, we believe that you should find him not guilty of that burglary simply because of the intent factor and he was in an impaired state of mind.

*Id.* at 155–56, 159–60, 166.

In rebuttal, the prosecutor conceded intoxication can be used to determine whether Lopez had the requisite specific intent and argued the evidence disproved the intoxication theory:

We should probably just for a moment talk about this intoxication.  Now, the most important thing that you need to understand is this voluntary—voluntary intoxication . . . .

20

> That alone is not an excuse.  It can be used, however, as my
> co-counsel has pointed out, perhaps for your determination of
> whether or not he—he formed the prerequisite requirements of
> specific intent to commit these crimes.  But it's not an excuse.

*Id.* at 177.

The trial judge instructed the jury that the prosecution had the burden of proof: "The Defendant is presumed innocent until the contrary is proved.  This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense." ECF No. 28-1 at 21. The judge instructed that the State must prove specific intent beyond a reasonable doubt and the jury may consider intoxication in determining whether the defendant had the specific intent required for the charges of attempted murder, burglary, and assault. *Id.* at 20, 22–23, 26.[7]

**b.    State Supreme Court's Determination**

On direct appeal, the Supreme Court of Nevada found the prosecutor's remarks concerning voluntary intoxication and specific intent did not constitute misconduct:

> [L]opez contends that the prosecutor committed numerous
> instances of misconduct.  When reviewing allegations of
> prosecutorial misconduct, we first consider whether the
> prosecutor's conduct was improper, and then determine whether
> any improper conduct warrants reversal. *See Valdez v. State,* 124
> Nev. 1172, 1188, 196 P.3d 465, 476 (2008).

---

[7] At the relevant time, Nevada's voluntary intoxication statute stated:

> No act committed by a person while in a state of voluntary
> intoxication, shall be deemed less criminal by reason of his or her
> condition, but whenever the actual existence of any particular
> purpose, motive or intent is a necessary element to constitute a
> particular species or degree of crime, the fact of the person's
> intoxication may be taken into consideration in determining the
> purpose, motive, or intent.

NRS § 193.220; s*ee also Nevius v. State*, 101 Nev. 238, 249, 699 P.2d 1053, 1060 (1985) (holding jury may consider voluntary intoxication if "some evidence" supports such a theory).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

> [L]opez contends that the prosecutor committed misconduct by misstating the law regarding voluntary intoxication. Because Lopez did not object, we review this contention for plain error. *Id.* at 1190, 196 P.3d at 477.  During closing argument, the State argued that voluntary intoxication does not play a legal role unless the intoxicated individual "is slurring, they can't talk, they can't hold their head up, they can't look straight, they're stumbling, their friends are carrying them. [They] literally can't figure out where they are or what they're doing."

> Lopez asserts that this suggested to the jury that they were prohibited from considering his defense of voluntary intoxication because he did not exhibit these symptoms, which shifted the burden of proof to him.  We disagree.  Considering the statements in context, the prosecutor appropriately argued that even if Lopez was intoxicated, he was not so intoxicated that he was unable to form the intent to commit the charged crimes.  Moreover, after the prosecutor made these comments, he went on to contrast individuals who merely make bad decisions while intoxicated from those who are so intoxicated that they cannot form specific intent, explaining that the jury had to look at the defendant's actions on the night in question to determine his intent.  Finally, the jury was properly instructed regarding the defense of voluntary intoxication, that the State bore the burden of proof, and that counsel's arguments are not evidence.  We conclude that Lopez fails to demonstrate plain error.

15 ECF No. 31-2 at 3–4.

16         **c.**        **Disposition of Ground 1(a)**

17       The trial judge properly instructed the jury that the State had the burden to prove beyond

18 a reasonable doubt the specific intent element for the charges of attempted murder, burglary, and

19 assault.  They also instructed the jury that it could consider Lopez's intoxication in determining

20 whether the State proved Lopez had the requisite specific intent for those crimes.  In closing and

21 rebuttal, the prosecutor conceded the jury must consider intoxication in determining whether the

22 State proved specific intent.  In response to the defense hypothetical in opening remarks

23 concerning specific intent, the prosecutor used a hypothetical to illustrate the difference between

poor decision-making and specific intent while intoxicated, to argue Lopez was not so

intoxicated he could not formulate specific intent.  Defense counsel countered in closing that the jury should follow the instruction on intoxication and pointed to evidence that Lopez had symptoms indicating he was so intoxicated he lacked the ability to form specific intent, including Robles's testimony that Lopez had "bloodshot eyes" and a "crazy" look just before he stabbed her, his daughter's testimony that he seemed like he had been drinking when they went to Robles's workplace a couple of hours before the stabbings, the fact that police found Lopez face down in the backyard, and Lopez's testimony about his consumption of beer, methamphetamine, and prescription medication.  In rebuttal, the prosecutor pointed to evidence that evinced specific intent, including Lopez's lying in wait for Robles, Lopez's statement that Robles must die when she refused to reunite with him, his threats to kill M.L., the number and life-threatening nature of the stab wounds to Robles and A.L., and his threats that the entire family must die together.  At no point did the prosecutor tell the jury Lopez had the burden to prove he was so intoxicated he lacked specific intent to commit the crimes.  On this record, it is objectively reasonable to conclude the remarks did not so infect the trial with unfairness as to result in a denial of federal due process.  Thus, the Supreme Court of Nevada's finding that there was no prosecutorial misconduct is neither contrary to nor constitutes an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, and that finding is not based on an unreasonable determination of the facts in the record.  Accordingly, Lopez is not entitled to federal habeas relief for ground 1(a).

I will, however, issue a certificate of appealability for ground 1(a).  Jurists of reason could debate the correctness of my decision that the Supreme Court of Nevada reasonably determined the prosecutor's argument did not constitute misconduct that so infected the trial with

1  unfairness as to make the resulting convictions for attempted murder, burglary and assault, a

2  denial of due process. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

3        **3.**      **Ground 1(b)—Cross-Examination about the Veracity of Witnesses**

4        Ground 1(b) alleges the prosecutor violated due process and committed misconduct by

5  asking Lopez whether the victims were mistaken in their testimony. ECF No. 17 at 10–13.

6        The prosecutor cross-examined Lopez repeatedly asking him whether Robles, A.L., M.L.,

7  and M.L.J. were "mistaken" in their accounts of his actions on the night in question, including

8  stabbing Robles and A.L. ECF No. 28-3 at 90–94.  Lopez did not challenge the veracity of his

9  family members, stating, *e.g.*, "They are free to say whatever they want.  I respect their

10  decisions, I'm not going to contradict them.  I love my children.  I respect what they say.  If they

11  say that, that's their problem." *Id.* at 90–91.  Defense counsel's objection that it was improper to

12  inquire whether other witnesses were mistaken or lying was overruled. *Id.* at 91–92.

13        The Ninth Circuit has held it is misconduct for a federal prosecutor to ask a defendant

14  whether another witness lied. *See United States v. Del Tort-Barboza*, 673 F.3d 1136, 1152 (9th

15  Cir. 2012) ("A prosecutor may not question a defendant on the stand and ask him whether

16  another witness was lying."); *United States v. Harrison*, 585 F.3d 1155, 1158 (9th Cir. 2009)

17  ("It's black letter law that a prosecutor may not ask a defendant to comment on the truthfulness

18  of another witness.").  In Nevada, the State is prohibited from asking a defendant whether other

19  witnesses are "lying" or "mistaken" unless, during direct examination, the defendant directly

20  challenges the truthfulness of those witnesses. *See Daniel v. State*, 119 Nev. 498, 519, 78 P.3d

21  890, 904 (2003).  However, neither the Supreme Court nor the Ninth Circuit has determined it is

22

23

24

1  improper for a prosecutor to ask a defendant whether another witness testified inaccurately.

2  *United States v. Greer*, 640 F.3d 1011, 1023 (9th Cir. 2011).

3      The Supreme Court of Nevada held the cross-examination here was misconduct but

4  harmless:

> 5      [L]opez contends that, because he had not challenged his
> family members' veracity during his direct examination, the
> 6      prosecutor committed misconduct by repeatedly asking him during
> cross-examination whether they were "mistaken" or not "truthful."
> 7      *See Daniel v. State,* 119 Nev. 498, 519, 78 P.3d 890, 904 (2003).
> On direct examination, Lopez disputed his family's version of the
> 8      events leading up to the attack, but stated he did not remember the
> attack itself and did not challenge their version of the attack.  On
> 9      cross-examination, the prosecutor repeatedly pushed Lopez
> towards commenting on the veracity of his family regarding the
> 10      unchallenged portions of their testimony.  We conclude that this
> constitutes misconduct, *see id.,* and the district court abused its
> 11      discretion by overruling Lopez's objection to these questions.
> However, we also conclude that these errors were undoubtedly
> 12      harmless in light of the substantial evidence presented at trial and
> no relief is warranted. *See* NRS 178.598; *Tavares v. State,* 117
> 13      Nev. 725, 732, 30 P.3d 1128, 1132 (2001) (an error is harmless
> unless it "had substantial and injurious effect or influence in
> 14      determining the jury's verdict" (internal quotation marks omitted)),
> *holding modified by Mclellan v. State,* 124 Nev. 263, 182 P.3d 106
> 15      (2008); *see also Valdez,* 124 Nev. at 1188–89, 196 P.3d at 476.

16  ECF No. 31-2 at 4–5.

17      Lopez cites no clearly established Supreme Court precedent holding a prosecutor's

18  questioning a witness about whether another witness is mistaken constitutes prosecutorial

19  misconduct.  Even deferring to the Supreme Court of Nevada's determination that the cross-

20  examination constituted prosecutorial misconduct as a matter of state law, it was objectively

21  reasonable to conclude the cross-examination was harmless.  Lopez's defense was not that he did

22  not undertake the actions involved in the offenses, but that he lacked requisite specific intent for

23  some of the charges.  Indeed, defense counsel specifically urged the jury to convict Lopez of

battery on Robles and A.L. with a deadly weapon resulting in substantial bodily harm

constituting domestic violence. *See infra*, at pp. 33–34.  The prosecutor did not ask Lopez

whether the other witnesses were lying; the prosecutor asked Lopez whether the other witnesses

were mistaken about their recall of the events on the night of the stabbings.  Lopez testified he

did not recall the stabbings and therefore could not comment on whether the other witnesses

were mistaken.  On this record, it was reasonable to conclude the cross-examination did not so

infect the trial with unfairness as to make the resulting conviction a denial of due process.  The

Supreme Court of Nevada's rejection of this claim is neither contrary to nor constitutes an

unreasonable application of clearly established federal law as determined by the Supreme Court,

and is not based on an unreasonable determination of the facts in the state court record.  Lopez is

not entitled to federal habeas relief for ground 1(b).

### 4.     Ground 1(c)—Closing Argument

Ground 1(c) alleges the prosecutor committed misconduct during arguments by

commenting on prohibited matter, ridiculing and belittling Lopez and his defense of intoxication,

and making remarks that were inflammatory, implied personal knowledge, and were unsupported

by the evidence. ECF No. 17 at 13–16.  The Supreme Court of Nevada rejected these claims:

> [L]opez contends that the prosecutor committed
> misconduct by (1) implying personal knowledge of the events,
> (2) making unsupported and speculative statements, (3) demeaning
> him and his defense, (4) inflaming the jury, and (5) commenting on
> prohibited matters.  Having considered the statements that Lopez
> challenges on appeal, we conclude that some crossed the line of
> appropriate advocacy; however, Lopez failed to object below, and
> none rise to the level of plain error. *See Valdez,* 124 Nev. at 1190,
> 196 P.3d at 477 ("[A]n error that is plain from a review of the
> record does not require reversal unless the defendant demonstrates
> that the error affected his or her substantial rights, by causing
> actual prejudice or a miscarriage of justice." (internal quotation
> marks omitted)); *see also Thomas v. State,* 120 Nev. 37, 47, 83
> P.3d 818, 825 (2004) ("[A] criminal conviction is not to be lightly
> overturned on the basis of a prosecutor's comments standing
> alone" (quoting *United States v. Young,* 470 U.S. 1, 11 (1985))).

1    ECF No. 31-2 at 5–6.

2            **a.**      **Ground 1(c)(1)—Argument about Methamphetamine**[8]

3       Lopez claims the prosecutor implied personal knowledge and experience about

4 methamphetamine that negated Lopez's voluntary intoxication defense. ECF No. 17 at 13–14.

5       Lopez testified he took a beer from Robles's refrigerator at 2:35 a.m. ECF No. 28-3 at 59.

6 He said he drank the beer in the blue truck until "approximately" 2:40 a.m., when he joined his

7 neighbors and smoked "a lot" of methamphetamine with them around 2:50 or 2:55 a.m. *Id.* at

8 25–26, 61–62.  On cross-examination, however, the prosecutor asked Lopez if he drank a huge

9 bottle of beer and smoked methamphetamine "in five minutes" between 2:55 and 3:00 a.m., and

10 Lopez replied, "Yes, correct, that's how it happened." *Id.*

11       As discussed, the prosecutor argued in closing that Lopez was not so intoxicated he could

12 not form the specific intent necessary for attempted murder, burglary, and assault.  Defense

13 counsel countered in closing that Lopez said it was the first time he consumed methamphetamine

14 while taking the prescription medication, and police found Lopez face down and passed out in

15 the backyard.  The prosecutor countered in rebuttal:

16           And let's talk about that meth.  The defense would like to
          believe that he had so much meth in his system that he passed out.

17           Methamphetamine amps you up.  That's why they call them
          tweakers.  You can't sleep.  You don't go to sleep.  You stay wide

18           awake.  So they keep on hanging their hat on this drug use and
          being drunk.  Perhaps he must have gotten some really bad meth

19           from Luigi that night because he passed out.

20       . . . .

21           I mean, during cross-examination it finally came out that he
          started drinking that beer at 2:55, and smoking a lot of meth at 2:55

22           with his buddy Luigi.  So Mario and Luigi are smoking meth up a
          storm and drinking a beer.  And then by 3:00 he's back laying in

23

---

[8] I subdivide ground 1(c) for clarity.

the car with a mirror, waiting in—in wait. I know tweakers do a
lot of fast things, but, boy, that was pretty fast. Not plausible.

*Id.* at 171–72, 178.

The remarks about the timing of Lopez's ingestion of methamphetamine were consistent with Lopez's testimony on cross-examination. The remarks that methamphetamine is a stimulant were based on reasonable inferences that could be drawn from Dr. Coates's testimony that methamphetamine can cause increased heart rate and elevated blood pressure, that individuals on methamphetamine "twitch a little bit," and "[o]ne of the common vernaculars is that they're twitching." Moreover, the prosecutor conceded Lopez was found "passed out." The trial judge also instructed the jury to consider only the evidence and that arguments and opinions of counsel are not evidence. *See supra*, at p. 23. On this record, it is objectively reasonable to conclude the prosecutor's remarks did not so infect the trial with unfairness as to make the resulting convictions a denial of federal due process. The Supreme Court of Nevada's rejection of this claim is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in the state court record. Lopez is not entitled to federal habeas relief for ground 1(c)(1).

**b.     Ground 1(c)(2)—Argument on Inferences from the Evidence**

Lopez claims the prosecutor's rebuttal argument improperly asked the jury to imagine details not supported by the evidence and raised the prohibited topic of domestic violence. ECF No. 17 at 15–16.

The trial judge ruled *in limine* that the State was prohibited from presenting evidence of prior acts of domestic violence and prior bad acts, finding they were substantially more

1  prejudicial than probative. ECF Nos. 24-15; 24-19; 24-20 at 14–15.  The prosecutor argued in

2  rebuttal arguments to the jury:

3          It screams of specific intent that he wanted to kill.  And
then when he saw his son, his own flesh and blood son, his first
4  born, and he looked at his son and he called him a puto, bitch.  If
he didn't have intent to kill, ask yourself how does a father take a
5  knife to a defenseless boy after calling him a puto, and start
stabbing him in the back?

6

7          You can almost see it that this poor boy tried to grab his
dad, you know, perhaps in a bear hug to try to stop him.  And what
does his dad do?  He stabs him in the back.  And then after he stabs
8  him four times, twice in the arm, twice in the back, he just lets that
boy go.  And, of course, he took off running because he probably
9  realized that his time was up.

10          Police sirens were going to be around the corner any
minute, and so he takes off running, perhaps ran in the direction
11  where the police were coming from.  And when he saw that he
decided, no, I still have business to finish.  I am not going to go
12  down for this.

13      . . . .

14          For him then to stick this into the person that he's losing
control gives him the satisfaction that at the end of the day he had
15  control.  To know that he had the satisfaction of having his wife's
warm blood on his own hands as he keeps on sticking this knife
16  into her one time, two times, three times, four times, five times, all
the way to 12 times.  That was very personal.  He wanted to kill
17  her.

18          And with that same thought, to do that to his own son, to
actually take this knife that unfortunately, as the State submits to
19  you, still has the dry blood of his wife and son on it.  To shove it in
there.  And why [A.L.]?  Because he was growing up and realized,
20  huh-uh, dad, it's not—you're not going to do this to us anymore.
You have to leave.

21

22  ECF No. 28-3 at 179–82.

23      The prosecutor's argument that Lopez may have expected to hear police sirens and

returned to the house to finish what he intended drew reasonable inferences from the evidence.

Michelle called 911 as soon as she saw Robles covered in blood, and after Lopez stabbed Robles and A.L., he exited the house only to return and tell everyone they were going to die.  Argument about blood on the knife drew a reasonable inference from Lopez's testimony that there appeared to be blood on the knife, evidence that Robles and A.L. suffered stab wounds inflicted by Lopez, and because police found Lopez with the knife. *See, e.g.*, ECF No. 28-3 at 95–96.  Argument that "perhaps" A.L. attempted to give his father a "bear hug" to stop him had no bearing on the outcome of the trial.  Finally, the remarks about Lopez's motivation for stabbing A.L. did not mention prior instances of domestic violence; instead, it drew a reasonable inference from testimony that Robles had a family court order prohibiting Lopez from residing with the family and from unsupervised visits with the children, A.L. asked Lopez to leave the residence earlier that afternoon, and M.L. believed Lopez blamed A.L. for Lopez's estrangement from the family.  On this record, it was objectively reasonable to conclude the prosecutor's remarks did not so infect the trial with unfairness as to make the resulting convictions a denial of due process.  The Supreme Court of Nevada's rejection of Lopez's federal claims of prosecutorial misconduct is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in the record.  Lopez is not entitled to relief for ground 1(c)(2).

### 5.    Ground 1(d)—Disparagement of Lopez and Intoxication Defense

Ground 1(d) alleges the prosecutor committed misconduct by ridiculing and belittling Lopez and his intoxication defense during cross-examination and rebuttal. ECF No. 17 at 16–18.

### a.    Ground 1(d)(1)—Cross-Examination

Lopez claims the prosecutor committed misconduct by belittling and ridiculing him during cross-examination (ECF No. 17 at 16–17):

Q: Okay. So you—you called [Robles] while you were already on the way to tell her you're on—you were going there to pick her up?

A: My daughter [M.L.] called [Robles] and she told her exactly what you just said.

Q: Okay.  But you didn't call her to say that?

A: No.  I can't be driving and talking on the phone.

Q: Oh, that's—we don't want to break any laws now do we?

A: That's right.

Q: But after all, you already put a fake license plate on that car, didn't you?  But this time you know that we can't drive a car while talking on a phone?

A: I knew I was doing things that were wrong.  Why would I add more to them?

Q: That's right, let's not commit anymore misdemeanors, right? Well, thank you for being law abiding.

ECF No. 28-3 at 53.

It was objectively reasonable to conclude the examination and remarks did not so infect the trial with unfairness as to violate due process because the examination clarified Lopez's testimony that he did not wish to suffer the consequences if he was stopped for illegally speaking on the telephone while at the same time driving an unregistered vehicle that sported a license plate for a different vehicle.  The Supreme Court of Nevada's rejection of this claim is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in the record.  Lopez is not entitled to relief on ground 1(d)(1).

/ / / /

### b.     Ground 1(d)(2)—Argument about Lapsed Memory

Lopez claims the prosecutor belittled him in rebuttal by asking the rhetorical question, "Is [Lopez] high on meth today that he can't seem to remember everything?" ECF No. 17 at 17.

In the rebuttal closing, the prosecutor argued:

> [A]lthough, [Lopez] doesn't—today when he took the witness stand, can't seem to remember doing anything to [A.L.]. And today he's claiming that it was—he was the victim of the assault and that he had to protect himself by self-defense.
>
> I mean, just look at his stories.  They keep on changing. From the opening statement it changes from the moment that you heard his statement to the police to today when he took the witness stand.  How many versions can Mario Lopez come up with?  Is he high on meth today that he can't seem to remember everything?

ECF No. 28-3 at 171.

It was objectively reasonable to conclude the remarks constituted argument concerning Lopez's credibility and did not so infect the trial with unfairness as to result in a denial of due process.  The Supreme Court of Nevada's rejection of this claim is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in the record. Lopez is not entitled to federal habeas relief for ground 1(d)(2).

### c.     Ground 1(d)(3)—Argument concerning Luigi

Lopez contends the prosecutor ridiculed his defense by referencing "Super Mario Brothers" in argument about Lopez smoking methamphetamine with Luigi. ECF No. 17 at 17.

Lopez testified his neighbors, including Sarah, George, and Luigi, invited him to smoke methamphetamine with them.  In rebuttal closing, the prosecutor argued:

> Perhaps he must have gotten some really bad meth from Luigi that night because he passed out.
> . . . .

> [D]uring cross-examination it finally came out that he started drinking that beer at 2:55, and smoking a lot of meth at 2:55 with his buddy Luigi.  So Mario and Luigi are smoking meth up a storm and drinking a beer.

ECF No. 28-3 at 172, 178.

The prosecutor's remarks were based on Lopez's testimony that Luigi and the others invited him to smoke methamphetamine with them.  There is no objectively reasonable basis to infer the remarks were a reference to Super Mario Brothers rather than a short-hand reference to the group of individuals who invited Lopez to smoke methamphetamine, as there were no references to Super Mario Brothers during the trial.  It was objectively reasonable to conclude the prosecutor's remarks did not so infect the trial with unfairness as to result in a denial of due process.  The Supreme Court of Nevada's rejection of this claim is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in the record. Lopez is not entitled to federal habeas relief for ground 1(d)(3).

### d. Ground 1(d)(4)—Admission of Guilt and Intoxication Defense

Lopez claims the prosecutor denigrated his concession of guilt and intoxication defense by arguing Lopez came up with it before trial to permit him an easy way out of convictions on the more serious charges. ECF No. 17 at 17–18.

In closing remarks, defense counsel argued the jury learned "[counsel] represented [Lopez] for over a year on this case." ECF No. 28-3 at 156.  Defense counsel argued Lopez was charged with seven crimes and urged the jury to convict him of only two of the crimes: "Listen to the name of the charge that we are asking you to convict [Lopez] of.  Battery with use of a deadly weapon resulting in substantial bodily harm constituting domestic violence." *Id.* at 164–

65.  Counsel argued the State failed to prove Lopez harbored specific intent necessary to commit the other crimes because Lopez was intoxicated:

> [B]ut if the State is questioning whether or not my client was actually high, and they want to imply to you that it's some form of fiction, now it's my obligation to go and ask these cops what the heck were you doing in this investigation?
>
> Let's talk a little bit about the police work, or lack thereof, in regards to—in regards to this case.  You know, the State asked this detective who testified that in a crime scene like this is it common to test for drugs?  And he said no.  Just because it's not common to test for drugs, it doesn't mean you shouldn't test for drugs.  Folks, if you're accused of stealing a candy bar at a store, I understand there's no need to have a drug test.  But if you want to charge my client with attempt[ed] murder and put him in a cage, you better believe that there better be a drug test.
>
> This is America, folks, and one of the many beauties of this country is that if you're accused of a crime, you have to prove each element of that crime beyond a reasonable doubt.  The cop[s] in this case acted like, hey, there's blood, we got the guy.  See ya, wouldn't want to be ya.  If I had a mic, I'd drop it.  You certainly see the problem, folks.  And because of this, these are doubts, and the State has not met their burden on these attempt murder charges.

*Id.* at 161–162.  In rebuttal, the prosecutor responded:

> It's easy now a year plus and several months later to say, oh, terrible police work, and they didn't commit everything that they should have done, and why didn't they test for drugs?  Because that's the one thing that they keep hanging their hat on, the fact that he may not have had the [indecipherable], ability to make the mindset for specific intent to commit attempt murder.
>
> It's very easy to stand in front of you and say, yep, I'm guilty of the lesser included-or the lesser related crime in this case, so, yep, find me guilty of the battery, I did it.

*Id.* at 171.

The prosecutor's remarks about the Lopez's defense theory were invited by Lopez's testimony and defense counsel's argument and were based on reasonable inferences drawn from the evidence. On this record, it is objectively reasonable to conclude the remarks did not so infect the trial with unfairness as to result in a denial of due process. The Supreme Court of Nevada's rejection of this claim is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in the record. Lopez is not entitled to federal habeas relief for ground 1(d)(4).

### 6.      Ground 1(e)—Cumulative Error

Ground 1(e) alleges even if the individual instances of alleged misconduct are harmless, they collectively violate Lopez's constitutional right to a fair trial because the comments as a whole so infected the trial with unfairness as to make the resulting conviction a denial of due process. ECF No. 17 at 18–19.

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302–03 (1973) (holding the rights to due process and a fair trial were violated because of the imposition of a combination of state hearsay and party witness voucher rules that deprived defendant the ability to either cross-examine an individual who had confessed repeatedly to the murder in question or to call witnesses to discredit the repudiation of the confession)). "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Id.* (citing *Chambers*, 410 U.S. at 290 n.3). If the evidence of guilt is overwhelming,

the errors are considered harmless, and the conviction will generally be affirmed; if the verdict is weakly supported by the record, it is more likely to have been affected by errors than one with overwhelming record support. *Id*. at 928 (citations and quotation marks omitted).

The Supreme Court of Nevada found no relief warranted based on cumulative error because the evidence of guilt was not close, and the misconduct it identified was not egregious:

> [L]opez contends that cumulative error warrants relief.  Having balanced the relevant factors, we disagree. *See Valdez,* 124 Nev. at 1195, 196 P.3d at 481 (considering: "'(1) whether the issue of guilt is close, (2) the quantity and character of the error, and (3) the gravity of the crime charged.'" (quoting *Mulder v. State,* 116 Nev. 1, 17, 992 P.2d 845, 854–55 (2000))).  Here, the issue of guilt was not close.  Although Lopez asserted at trial that he had consumed numerous intoxicants and his wife instigated the attack, this version was inconsistent with statements he had previously given and with a majority of the evidence.  Moreover, substantial evidence indicated that Lopez was not intoxicated to the extent that he was unable to form the intent to commit the charged crimes.  Finally, although the crimes were grave, the misconduct we have identified was not egregious. *Cf. Valdez,* 124 Nev. at 1198, 196 P.3d at 482.

ECF No. 31-2 at 6–7.

The Supreme Court of Nevada's rejection of this claim is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in the record. That court reasonably concluded the case for guilt was not close.  Before the stabbings, Lopez told his daughters they and Robles would "pay," and Robles would "regret" not letting him drive her home from work.  Lopez lay in wait for Robles to return home and when she refused to talk to him and locked him out of the house, he snuck in through a separate door and waited outside the laundry room.  When Robles opened the door and told Lopez they would not reunite as husband and wife, he told her she would die and commenced stabbing her with a knife.  When M.L. appeared, he told her she was going to die too; and when A.L. came out, Lopez stabbed

him multiple times.  Lopez ran out of the house only to return and threatened his family with death.  Lopez admitted his statement to police is markedly different from his story at trial, and his counsel conceded Lopez was guilty of stabbing Robles and A.L. and disputed only whether Lopez was so intoxicated he was not guilty of the specific intent crimes.  Due to the strength of the evidence, and because the identified misconduct had no bearing on the intoxication defense, it was objectively reasonable for the Supreme Court of Nevada to conclude there was no cumulative error that denied Lopez a fundamentally fair trial.  Lopez is not entitled to relief for ground 1(e).

I will, however, issue a certificate of appealability for ground 1(e) because it follows that jurists of reason could debate the correctness of my decision that the Supreme Court of Nevada reasonably determined there is no cumulative error based on prosecutorial misconduct, given my issuance of a certificate of appealability for ground 1(a). *See Slack*, 529 U.S. at 484.

**B.      Ground 3(a)—Counsel's Failure to Object to Prosecutor's Closing Remarks**

Ground 3(a) alleges Lopez was denied the right to effective assistance of trial counsel in violation of the Sixth Amendment because counsel failed to object to the prosecutor's cross-examination and argument as alleged in grounds 1(c)–(d). ECF No. 17 at 35–39.

**1.      Effective-Assistance-of-Counsel**

A petitioner claiming ineffective assistance of counsel must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness," and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  A

1  court may consider these issues in either order, and if the petitioner fails to satisfy one the court

2  need not consider the other. *Id.* at 697.

3        "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only

4  the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013).  A court "must indulge a

5  strong presumption that counsel's conduct falls within the wide range of reasonable professional

6  assistance." *Strickland*, 466 U.S. at 689.  On the performance prong, the issue is not what

7  counsel might have done differently, but whether counsel's decisions were reasonable from

8  counsel's perspective at the time. *Id.* at 689–90.  A petitioner making an ineffective assistance

9  claim "must identify the acts or omissions of counsel that are alleged not to have been the result

10  of reasonable professional judgment." *Id.*  In considering such claims, a court is obligated to

11  "determine whether, in light of all the circumstances, the identified acts or omissions were

12  outside the wide range of professionally competent assistance." *Id.*  Strategic choices made "after

13  thorough investigation of law and facts relevant to plausible options are virtually

14  unchallengeable." *Id.*  On the other hand, "strategic choices made after less than complete

15  investigation are reasonable precisely to the extent that reasonable professional judgments

16  support the limitations on investigation." *Id.* at 690–91.  It is a petitioner's burden to show

17  "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . .

18  by the Sixth Amendment." *Id.* at 687.  To establish prejudice, it is not enough for the petitioner

19  "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at

20  693.  The errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result

21  is reliable." *Id.* at 687.

22        "Establishing that a state court's application of *Strickland* was unreasonable under

23  § 2254(d) is all the more difficult" as "[t]he standards created by *Strickland* and § 2254(d) are

both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *See Richter,* 562

U.S at 105 (internal citations omitted); *see also Cheney v. Washington,* 614 F.3d 987, 995 (9th

Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under

AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's

description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry,* 540 U.S. 1, 6

(2003)).

### 2.     State Appellate Court's Determination

Lopez's state court habeas petition was denied.  On appeal, the Nevada Court of Appeals

determined Lopez failed to establish *Strickland*'s prejudice prong.  It based its decision on the

fact that the Supreme Court of Nevada ruled during the direct appeal that the substantive claims

of prosecutorial misconduct did not constitute plain error and the evidence of guilt was not close:

> Lopez claimed his trial counsel was ineffective for failing to object
> when the State made improper statements during closing and
> rebuttal arguments.  Lopez contended the State implied personal
> knowledge of the events, discussed facts not in evidence,
> demeaned the defense, inflamed the jury, and commented on
> prohibited matters.  Lopez failed to demonstrate resulting
> prejudice.  The challenged comments were reviewed on direct
> appeal under a plain error standard and the Nevada Supreme Court
> found none of the challenged comments rose to plain error, and
> further concluded the issue of "guilt was not close." *Lopez v. State,*
> Docket No. 65048 (Order of Affirmance, October 16, 2014).
> Given the Nevada Supreme Court's conclusions and the substantial
> evidence of Lopez'[s] guilt produced at trial, which included his
> incriminating statements, Lopez failed to demonstrate a reasonable
> probability of a different outcome had counsel raised objections to
> the challenged comments.  Therefore, we conclude the district
> court did not err by denying this claim without considering it at the
> evidentiary hearing.

ECF No. 34-13 at 2–4.

### 3.      Deferential Review of *Strickland* Prejudice Prong for Ground 3(a)

The Nevada Court of Appeals' rejection of this claim is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in the record.  It was objectively reasonable to conclude there is no reasonable probability the result of the proceedings would have been different had counsel objected to the prosecutor's examination and remarks as alleged in grounds 1(c)–(d), for the reasons discussed earlier in this order.  Lopez is not entitled to federal habeas relief for ground 3(a).

### C.      Ground 4—Failure to Remove Counsel due to Conflict

Ground 4 alleges the state district court's refusal to remove counsel based on an alleged conflict with counsel's investigator violated Lopez's rights to due process and to counsel guaranteed by the Fifth and Sixth Amendments because the trial court failed to exercise its obligation to inquire of Lopez about the basis for this belief in the conflict. ECF No. 17 at 42–44.

### 1.      Additional Background Information

Before trial, Lopez's public defender filed two motions to allow the Clark County Public Defender's Office to withdraw as Lopez's counsel because Lopez and his family had once lived for two years with the cousin of the lead defense investigator. ECF Nos. 24-10; 24-16.  For the first motion, the state district court held a hearing on July 9, 2013, at which the Public Defender Lead Chief explained Lopez was "uncertain about how hard our investigator is working" because the investigator's cousin "didn't care for him . . . ." and Lopez "thinks that we're not investigating the case properly . . . and we're not going to try the case because of the family relationship." ECF No. 24-12 at 3–4.  Lopez's public defender stated that he had represented Lopez for almost a year, and they had a "fantastic relationship" but "the Public Defender

believes that there is a conflict in this case" because there is "an appearance of impropriety." *Id.*

at 4–6.  Counsel explained that Lopez told him he did "not trust now what's going on . . . ." *Id.*

Counsel argued there is an appearance of impropriety because the victims in the case are the

family members who lived with the investigator's cousin and counsel will "be grilling" them at

trial. *Id.* at 5–6.  The State opposed the motion contended there's no conflict "just because once

upon a time these people lived together" and the appearance of impropriety could be cured by

assigning a new investigator. *Id.* at 6–7.  The state district court denied the motion:

> THE COURT: All right.  Court finds that there's no appearance of impropriety.  Simple family relationship between the investigator and someone that Defendant may have lived with in the past does not create the appearance of impropriety.  One answer could be to replace the investigator, but I'm not even sure that there has been nothing here to show that there's any reason whatsoever to replace the investigator on this case.  Simple paranoia on the part of the Defendant is not enough to raise the appearance of impropriety or cause or give rise to a reason to change the way his case is being handled by the defense or by the investigator on the defense.
>
> There hasn't been anything stated in the motion or in Court here today that would give rise to any question regarding the investigator's past behavior or current behavior, future behavior.  There is definitely nothing that would require the removal of the attorneys especially since you have a relationship with the client and this is [sic] case is coming up for trial and you've had the case now for over a year or close to a year.  So, your motion to withdraw due to conflict I find there's no basis for it and your motion's denied.

*Id.* at 7–8.

A new investigator was assigned to Lopez's case. ECF Nos. 24-14 at 3; 24-17 at 5.

Lopez's public defender filed a second motion to withdraw as counsel, citing Lopez's growing

distrust of the public defender's office and Lopez's statement to counsel that the lead defense

investigator had conspired with his cousin, with whom the Lopez family had previously lived, to

sell Lopez's children. ECF No. 24-16 at 4.  At a hearing sometime before the hearing on the

second motion to withdraw, Lopez personally addressed the state district court stating, "I made a motion so I can change attorneys.  I don't know if you have the opportunity to change that 'cause the attorney's always making—postponing things and giving me excuses.  He won't answer the phone.  I don't feel like he's doing his job.  He's not defending me as he should be." ECF No. 24-18 at 4–5.  The state district court informed Lopez his attorney filed a motion to withdraw as counsel and the motion would be heard later. *Id.*

At the August 27, 2013, hearing on the second motion to withdraw, the state district court inquired about the allegations concerning the prior investigator's cousin:

> THE COURT: Counsel, have you checked with your investigator and inquired as to whether or not he was trying to sell these kids and his ex-wife or his ex-girlfriend?
>
> [DEFENSE COUNSEL]: Your Honor, I have spoke[n] with [the investigator].  He represented to me that he would be available—
>
> THE COURT: No.  Has he—had he—did you ask him, hey are you trying to sell these people?
>
> . . . .
>
> THE COURT: I want this on the record that you've checked—
>
> [DEFENSE COUNSEL]:  Yes, Your Honor—
>
> THE COURT: —and he said no.
>
> [DEFENSE COUNSEL]: —I have and it's—it's absolutely inaccurate and ridiculous.
>
> . . . .
>
> THE COURT: Okay, And also in your brief Mr. Lopez apparently doesn't trust your office or trust you as well.

ECF No. 24-20 at 5.

Defense counsel explained he received an email from his interpreter stating Lopez contacted the office asking if the investigator is planning on testifying, that Lopez "doesn't trust

our office," and because of that counsel believed "there's a conflict in this case." *Id.* at 6. The State argued the notion the investigator is a human trafficker is "a ludicrous position" and the motion should be denied because the lack of trust has to do with the investigator and not counsel. *Id.* at 7. The state district court denied the motion:

> THE COURT: Well, on this issue here whether or not, Mr. Lopez, you have some at least it appears some delusion right now that their investigator is trying to sell your kids and it doesn't seem like there's any evidence whatsoever in that regard. And whether or not you trust your attorneys or you trust the investigator is not the issue before me. I'm looking at whether or not counsel is competent to represent you, whether or not he's ready to represent you and you have a new investigator on the case and apparently they're doing what they need to do 'cause you've said you're ready on this case.
>
> So, I don't find a conflict here because your client doesn't trust you. That's very common as you now [sic] in defense practice for some reason. Sometimes Defendants just don't like their attorneys and so no reflection on you, counsel. It's just—I'm not going to grant the motion.

*Id.* at 7–8.

### 2.    Applicable Legal Principles

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel at all critical stages of the proceeding. *Coleman v. Alabama*, 399 U.S. 1, 7 1970. "The Sixth Amendment right to counsel includes the 'correlative right to representation that is free from conflicts of interest.'" *Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). To establish a Sixth Amendment violation, a defendant must show "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980). "Upon notification that an actual or potential conflict of interest exists, a trial court has the obligation 'either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate

counsel.'" *Id.* (quoting *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978) and *Wood*, 450 U.S. at 272 n.18).  "If the trial court fails to undertake either of these duties, the defendant's Sixth Amendment rights are violated." *Id.* (citing *Holloway*, 435 U.S. at 484.)

The Supreme Court cases involving conflicts of interest concern conflicts between a defendant and other clients that counsel represented. *See Mickens v. Taylor*, 535 U.S. 162, 166–167, 171 (2002) (holding "[W]e think 'an actual conflict of interest' meant precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." (citing *Sullivan*, 446 U.S. at 349–350 (emphasis in original)); *Wheat v. U.S*, 486 U.S. 153, 163–64 (1988) (holding in multiple-representation cases, a district court must help protect criminal defendants against counsel's conflict of interest); *Wood*, 450 U.S. at 271–72 (discussing potential conflicts arising from counsel hired by defendants' employer); *Sullivan*, 446 U.S. 335; *Holloway*, 435 U.S. at 481 (holding joint representation of codefendants is not per se unconstitutional).  The Ninth Circuit has established a test for assessing whether an "irreconcilable conflict" between a defendant and counsel warrants substitution of counsel. *See United States v. Moore*, 159 F.3d 1154, 1158–59 (9th Cir. 1998) (holding substitution of counsel because of an irreconcilable conflict is based on consideration of "(1) the extent of the conflict; (2) the adequacy of the inquiry [by the trial court]; and (3) the timeliness of the motion [for substitution of counsel]."); *see also Young v. State*, 120 Nev. 963, 965, 102 P.3d 572, 574 (2004) (adopting *Moore*'s three-part-test in Nevada).  The Supreme Court of the United States has never endorsed this test. *Carter v. Davis*, 946 F.3d 489, 508 (9th Cir. 2019); *see also Parker*, 567 U.S. at 49 (holding the Sixth Circuit erred in applying its circuit's "multistep test" that bore scant resemblance to the general rules announced by the Supreme Court).

/ / / /

### 3.     State Supreme Court's Determination

The Supreme Court of Nevada rejected this claim on direct appeal:

> Appellant Mario Alejandro Lopez contends that the district court abused its discretion by denying his motions to substitute counsel without questioning him personally.  When determining whether a district court abused its discretion by denying a motion to substitute counsel, we consider (1) the alleged extent of the conflict, (2) the adequacy of the court's inquiry, and (3) the timeliness of the defendant's motion. *Young v. State,* 120 Nev. 963, 968–69, 102 P.3d 572, 576 (2004).  Here, after the trial date was reset twice, defense counsel moved to withdraw on the ground that his investigator's cousin lived with Lopez years before the incident in question.  Counsel explained that he and Lopez had a "fantastic" relationship and he did not want to withdraw but needed to bring the issue to the court's attention.  The district court concluded that the circumstances did not warrant substitution; a new investigator was assigned and trial was reset a third time. Shortly thereafter, counsel moved to withdraw again, explaining that Lopez now believed the former investigator had tried to sell his children and therefore he did not trust counsel and the public defenders' office.  The district court questioned counsel regarding the extent of the conflict; counsel did not assert that there had been a breakdown in communication, he made clear that there was no merit to Lopez's allegations, and he announced that he was ready for trial.  Under these circumstances, we conclude that the district court did not abuse its discretion by concluding that there was not a conflict sufficient to warrant substitution and denying Lopez's motions. *See Gallego v. State,* 117 Nev. 348, 363, 23 P.3d 227, 237–38 (2001), *abrogated on other grounds by Nunnery v. State,* 127 Nev.___, 263 P.3d 235 (2011).

ECF No. 31-2 at 2–3.

### 4.     Disposition of Ground 4.

Lopez cites no clearly established federal law that a defendant's personality conflict with counsel's investigator can establish a conflict of interest with defendant's counsel.  Moreover, it was objectively reasonable to conclude the state district court took adequate steps to ascertain whether there was a conflict of interest between Lopez and his counsel and whether the alleged conflict was too remote to warrant separate counsel.  Contrary to Lopez's statement to the court

45

that counsel was "postponing things," not answering the phone, and "not doing his job," the state district court addressed those concerns by confirming counsel and his staff communicated with Lopez, had a good relationship with Lopez, and counsel was prepared for trial. The Supreme Court of Nevada's rejection of this claim is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in the record. Lopez is not entitled to federal habeas corpus relief for ground 4.

## IV.     Certificate of Appealability

This is a final order adverse to Lopez. Rule 11 of the Rules Governing Section 2254 Cases requires the court to issue or deny a certificate of appealability (COA). I have evaluated Lopez's claim and my decisions to determine whether to issue a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying this standard, I find a certificate of appealability is not warranted for any of the grounds in the petition except grounds 1(a) and 1(e) as stated above. *See Slack,* 529 U.S. at 484.

## V.     Conclusion

I THEREFORE ORDER that grounds 1, 3(a), and 4 are **denied** on the merits; grounds 2, and 3(b) are **dismissed** without prejudice as unexhausted; and the petition **(ECF No. 17) is denied** with prejudice.

I FURTHER ORDER that any requests for an evidentiary hearing are **denied**.

I FURTHER ORDER that a Certificate of Appealability is **granted for grounds 1(a) and 1(e)** and **denied for all other grounds** in the petition**.**

I FURTHER ORDER the clerk of the court to enter a final judgment in favor of the respondents and against Lopez dismissing this action with prejudice and to close this case.

Dated: March 2, 2023.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE